### KIRKPATRICK v. EASTERN MILLING & EXPORT CO. (2.)

(Circuit Court, D. New Jersey. December 14, 1904.)

No. 57.

1. CORPORATIONS—RECEIVERS—PETITION FOR OWNERS TO TURN OVER PROPERTY —PRACTICE.

A petition for an order on the receivers of an insolvent corporation, of which the court has taken charge, to turn over certain property claimed by the petitioners, is simply an application for incidental administrative relief, and is not adapted to the determination of substantive issues. The only question to be considered, therefore, is whether the petitioners have shown such title to the property that the court ought in justice to direct the receivers to surrender it.

2. SAME—MERITS OF CONTROVERSY WITH OPPOSING CLAIMANTS.

Where, in such case, the property claimed consisted in certain stock certificates made out to the subscribers to an underwriting agreement to

take bonds, to which the stock was to be a bonus, and the agreement and bonds had been transferred by the corporation to the petitioning bank as collateral security for a loan, but not the stock, except impliedly, the subscribers to the underwriting agreement, although made parties to the proceedings, were not entitled to set up therein, and have determined, the defenses which they had on the merits to the enforcement of the underwriting agreement against them.

3. CORPORATIONS—ASSIGNMENT OF AGREEMENT UNDERWRITING BONDS—CONSTRUCTION—MATTERS ESSENTIAL TO ENFORCEMENT.

Certain persons executed an underwriting agreement with a corporation by which they agreed to purchase bonds to be issued by it at a stated price, each to receive as a bonus common stock of the corporation equal to 75 per cent. of the face of the bonds taken by him. The bonds and stock in the several amounts called for by the agreement were executed, but, before the time arrived for their delivery, the bonds were pledged by the corporation to a bank to secure a loan, together with an assignment of · the underwriting agreement, authorizing the bank to enforce the same by suit in the company's name in case of default. For some reason the stock was not delivered to the bank. *Held*, that the assignment carried with it, as a necessary incident to make it effective, the right to such stock, and that, the corporation having become insolvent and passed into the hands of receivers, the bank was entitled to an order requiring them to turn over to it the certificates of stock which had come into their possession, that it might tender the same, with the bonds, to the underwriters.

4. SAME—ASSIGNABILITY OF UNDERWRITING AGREEMENT.

An underwriting agreement with a corporation by which the subscribers agreed to purchase an issue of its bonds is assignable by the corporation to a pledgee of the bonds.

5. SAME—AUTHORITY OF OFFICERS—PLEDGE OF ASSETS.

Where the president and secretary of a corporation pledged certain of its bonds to secure a loan, at the same time giving the pledgee a written assignment of an underwriting agreement for such bonds, executed by them over the seal of the corporation, they were acting within the apparent scope of their authority; and the pledgee, who took the assignment without notice of any limitation on their authority, is not bound by such a limitation, but is entitled to enforce the contract in accordance with its terms.

In Equity.    Sur petition of Corn Exchange National Bank for order on receivers to deliver certain certificates of stock, and answers of receivers and others thereto.

H. Gordon McCouch, Samuel Dickson, and Henry S. Drinker, for petitioner.

H. Reynolds Brown, for respondents.

ARCHBALD, District Judge.[1]    This being a hearing on petition and answer, the facts, in case of a conflict, are, of course, to be taken as stated in the latter, although, in the view which I take of the case, this is not very material.

The character of the proceeding determines, in large measure, the disposition to be made of it.    It is simply for the purpose of securing certain incidental administrative relief, growing out of the fact that the corporation which is the defendant in the original bill has been put by the court into the hands of receivers, and it is not, in consequence, adapted or designed for the determination of substantive issues.    The

[1] Specially assigned.

court is appealed to, to direct the receivers, by whom it has assumed to take charge of the corporate assets and affairs, to turn over certain property to which the petitioners lay claim, which has come into the receivers' hands. Confining our attention to this question, much that is set up in the answer becomes immaterial; nor is there anything in conflict with this view in the former ruling of this court by which it was held that the parties to the underwriting agreement to be presently referred to were entitled to be heard, and should be brought in as respondents, as they now have been; the character and extent of the hearing to be accorded them not having been passed upon. The only question, therefore, to be considered, is whether the petitioners have shown such title to the property in controversy that the court ought, in justice, to direct the receivers to turn it over to them.

It is the undisputed fact that on January 29, 1903, by agreement in writing with the corporation whose affairs are being administered, the respondents (other than the receivers), all of whom are stockholders and most of whom are directors of the company, subscribed for an issue of $600,000 5 per cent. income bonds, which it was decided to put out. These bonds were to be taken and paid for by them severally on or before February 1, 1904, in varying sums, at 50 per cent. of their par value, and therewith they were to receive as a bonus common stock of the company to the amount of 75 per cent. of the face value of the bonds allotted to each. This undertaking, however, was never carried out, and, the necessities of the corporate business requiring it, on May 13, 1903, a loan of $25,000 for two months was obtained from the Corn Exchange Bank, the petitioners; the bonds and the underwriting agreement by which the respondents were obligated to take them being pledged as collateral security. But whether by inadvertence or otherwise, the certificates for the shares of stock to which each would be respectively entitled, although actually made out and executed, were not turned over to the bank, and, being now in the hands of the receivers, by whom they were obtained along with the other papers of the company, the present proceeding has been instituted to secure them.

The right of the bank to the relief asked for depends on whether the written assignment by which the underwriting agreement was transferred to it, a copy of which is given in the margin,[2] was effective to

[2] In consideration of the discount by the Corn Exchange National Bank of the note of this company for twenty-five thousand dollars, payable two months after date, and as security for the repayment thereof the Eastern Milling and Export Company hereby pledges six hundred thousand mortgage bonds, with the right to sell the same upon default, as specified in the terms of the collateral note, and further hereby assigns, transfers and sets over to the Corn Exchange National Bank all its right, claim and demand under the Memorandum of Agreement of January 30, 1903, between the said company and the underwriting subscribers thereto, and authorizes the said bank, in case of default, to bring suit in the name of the Eastern Milling and Export Company against any and all of the said subscribers.

In Witness Whereof, the Eastern Milling and Export Company has caused its corporate seal to be hereunto affixed, duly attested, this thirteenth day of May, 1903.

[Seal]                                   Eastern Milling and Export Company.
Attest:                                                            B. K. Freed,
   George E. Heilig,                                           President.
      Secretary.

carry title to the certificates which are now demanded. Of this, as it seems to me, there can be no doubt. By it the milling company, in express terms, assigns, transfers, and sets over to the bank "all its right, claim and demand under the Memorandum of Agreement of January 30, 1903, between the said company and the underwriting subscribers thereto, and authorizes the said bank, in case of default, to bring suit in the name of the * * * company against any and all of the said subscribers." The bank is thus invested in the fullest manner with the rights of the company to and under the agreement, and therewith, by implication, with whatever is essential to the exercise and enforcement of those rights. To this the possession of the stock certificates is unquestionably material. While intrinsically worthless, their production and tender—technically at least—is a prerequisite to any demand upon the respondents for a fulfillment of their part of the agreement, and the manifest purpose in opposing a delivery at this time is to block any such demand. The whole value to the bank of the underwriting agreement, including the right to sue which is expressly given, is thus made to depend on the possession of these certificates, which it must therefore be assumed it was the intention of the company that the bank should have, although not expressly mentioned in the assignment. Batesville Institute v. Kauffman, 18 Wall. 151, 21 L. Ed. 775; New Orleans Co. v. Montgomery, 95 U. S. 16, 24 L. Ed. 346; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; City of Wichita v. Old Colony Trust Co. (C. C. A.) 132 Fed. 641; Gallagher v. Nichols, 60 N. Y. 438; Lemmon v. Strong, 59 Conn. 448, 22 Atl. 293, 12 L. R. A. 270, 21 Am. St. Rep. 123; Esty v. Graham, 46 N. H. 169; Schlieman v. Bowlin, 36 Minn. 198, 30 N. W. 879. They have been long since made out in due form by the proper officers of the milling company, according to the number of shares that the several parties would be entitled to, and nothing remains to be done but to turn them over to the bank as is now asked. To this, in my judgment, they are entitled, under the showing that has been made.

It is said, however, that the underwriting agreement was not assignable; having a distinct personal character; being made with the corporation, which alone was competent to say when and how far it should be enforced. But agreements of this kind, representing large values, are being constantly assigned and accepted as the basis for the organization of incorporated companies, and it would seriously disturb prevailing ideas in the business world if any such doctrine were announced as is now contended for. Recognizing this, and not being willing to go that far, the learned counsel for the respondents endeavors to distinguish the present case by the suggestion that the usual underwriting agreement is with individual promoters, in anticipation of the transfer to a corporation to be formed, and not, as here, with the corporation itself. But this only serves to emphasize the unsoundness of the position taken, for with individuals, much more than with a corporation, which has no personality, would the agreement take on a personal form; and, as it is conceded that it would not do to impose any such limitation in the one case, neither would it in the other.

It is further said that the resolution on which the loan from the

bank was predicated [3] only authorized a pledge of the bonds, and not an assignment of the subscriptions for them, and that the officers of the company therefore exceeded their powers. But it is not shown that the bank knew anything about the resolution, or the limitation contained in it, if that is the construction it is to bear; and as the making of the loan, and the pledging of any or all of the corporate assets, were within the apparent authority of the directors, acting through the president and secretary, by whom the assignment was executed, backed up by the corporate seal, the bank, having parted with its money on the strength of the assignment, is now entitled to enforce it according to its terms. 10 Cycl. Law & Proc. pp. 765, 903, 917.

The other matters relied upon by the respondents, such as the alleged understanding with the company that they were not to be called upon, except under certain contingencies; the changed conditions since the execution of the agreement, including the insolvency of the company, which make it inequitable that they should have to pay for worthless securities; and the recent resolution by which they claim to have been released from liability—all go to the question whether the agreement can be enforced against them by the bank when it is put in shape to do so, and cannot be considered here. As was well said at the argument, if the court cannot pass upon the merits in favor of the petitioners, as it certainly cannot, involving, as it would, a money decree against the respondents on their subscriptions, neither can it pass upon the merits against the petitioners, denying them the preliminary relief which they ask. The same may be said of the contention that the undertaking of the respondents being for the aggregate sum of $300,000—50 per cent. of the par value of the bonds—there is no way of adjusting this to the $25,000 for which it is pledged, and to which extent, therefore, it is alone enforceable. Without intending to prejudge this question, attention may be called to the fact that the agreement of the respondents is not only joint, but several; and, even if this were not so, there would not seem to be any great difficulty in dealing with it either legally or equitably.

Let an order be drawn directing the receivers to turn over to the petitioners the certificates asked for, without prejudice otherwise to the rights of the respondents.

[3] "Resolved that the proper officers be authorized to make a short loan of $25,000 or $30,000, pledging as collateral security for the same the entire issue of $600,000 income bonds."